FILED

2008 Oct-21  PM 02:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DENISE JONES,                    }
                                 }
        Plaintiff,               }
                                 }      CIVIL ACTION NO.
v.                               }      07-AR-1807-S
                                 }
LAFARGE NORTH AMERICA, INC.,     }
                                 }
        Defendant.               }

**MEMORANDUM OPINION**

Before this court is the motion of defendant, Lafarge North America, Inc. ("Lafarge"), for summary judgment. Plaintiff, Denise Jones ("Jones") is suing Lafarge, her employer, seeking declaratory judgment, equitable relief, and money damages.  Jones claims that Lafarge discriminated against her based on her race and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Jones also claims race discrimination against Lafarge pursuant to 28 U.S.C. § 1981. For the reasons that follow, Lafarge's motion for summary judgment will be partially granted and partially denied.

*I. Summary Judgment Facts*[1]

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met his burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for

In 2000, Jones, a black female, was hired by Blue Circle, Inc., as a hourly worker at its packing/shipping plant in Calera, Alabama. In 2001, Lafarge bought the plant. When she filed her complaint, Jones was still in the employment of Lafarge. The alleged adverse employment action, failure to promote Jones to packhouse supervisor,[2] occurred on or about August 28, 2006. The following discussion provides the undisputed material facts and sufficient background information that led up to the decision.

Lafarge[3] is a multinational corporation whose primary business is the extraction and creation of usable materials, including the extraction of limestone from quarries and the manufacture of cement.[4] The plant in Calera, Alabama, is known as the "Roberta Plant." Once the limestone is removed from the quarry, it is crushed and heated into cement and then packaged and shipped by the

---

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

[2] The pleadings create some confusion as to the actual title of the sought after position. The complaint refers to the job as "packhouse coordinator" and several of the deponents refer to the job as "packhouse supervisor" and the job opportunity form, discussed *infra*, refers to the job's official title as "shipping supervisor." For clarity, the court will refer to the job as "packhouse supervisor." Also of note, the parties appear to use the terms "shipping department" and "packhouse" interchangeably.

[3] Lafarge calls itself is an Equal Opportunity Employer. It has a anti-harassment and sexual harassment policy which Jones acknowledges receiving.

[4] Cement is the main component of concrete. The Roberta plant also does some degree of work with lime and mortar.

2

shipping department. Generally, the shipping department's day-to-day purpose is first to "bag" the cement and load the cement in railroad cars and/or heavy trucks. To accomplish this, the hourly employees at the Roberta Plant perform five central tasks. Employees work as packers, a palletizers, forklift operators, bulk truck loaders, and/or bulk rail loaders.[5] On or about July 12, 2000, Jones began working for Blue Circle as a packer. Blue Circle hired employees to perform one or two of the above five tasks. When Lafarge purchased the Roberta Plant in 2001 it made a few operational changes. Lafarge reclassified all floor-level employees as "Operator I." An Operator I employee was then tasked with cross-training on all five tasks, even though the employee might, in fact, spend most of his or her shift on one particular task.[6]

Lafarge also kept many of Blue Circle's personnel, including Jones and several managers. In 2006, the pertinent managers/decision-makers in the promotion process were (1) the packhouse coordinator/supervisor, Richard Buffkin ("Buffkin"), white male, (2) the packhouse manager, Lynn Wehrmeier,

---

[5] Generally, a "packer" is responsible for the bagging of cement, which includes the monitoring and troubleshooting of the industrial packing machine and other equipment on the packhouse floor. A palletizer is the operator of the machine that places the bags of cement/lime onto a pallet. A forklift operator takes the pallets and other bagged cement to storage or to the trucks and rail cars. Bulk truck and rail loaders utilize a loading machine which loads the trucks and rail cars.
    Of note, packer and palletizer positions are referred to as the "packhouse jobs."

[6] The central purpose of the cross-training was for flexibility, particularly in overtime scheduling.

3

("Wehrmeier"), white male, (3) the operations manager, Terry Bennett ("Bennett"), white male, (4) the special projects manager, Simon Ward ("Ward"), white male, (5) the human resources manager, Danielle Stokes ("Stokes") black female, and the plant manager, (6) Alain Schooner ("Schooner"), white male. Buffkin was the packhouse supervisor. Buffkin directly supervised Jones and the three other interviewees for the packhouse supervisor position.[7] Buffkin reported to Wehrmeier, who reported to Bennett, who reported to Schooner. Stokes and Ward (who reported to various management personnel) were also part of the interview process. Notably, according to Stokes's testimony, of the approximately twenty-six supervisors employed at the Robert Plant in August 2006, there were two black male supervisors and two female supervisors. Neither of the two female supervisors is black. In addition, of the approximately twenty Operator I's working in the packhouse, Jones is the only female.

The four candidates for the packhouse supervisor position were all Operator I's in the shipping department. The candidates were (1) Stephen Clements ("Clements"), white male, (2) Forrest Walker ("Walker"), white male, (3) Ward Connor ("Connor"), black

---

[7] The four candidates are discussed *infra*. Lafarge decided to add another packhouse supervisor position because Buffkin and Wehrmeier were becoming overtasked with the current workload.

4

male, and (4) Denise Jones, black female.[8] Lafarge ultimately hired Forrest Walker on or about August 28, 2006.

Lafarge conducted annual reviews[9] of each Operator I employee, wherein the supervisor, usually Buffkin, sat down with each employee to review the employee's performance over the previous year. Lafarge also filled out a corresponding form styled "employee evaluation," wherein it rated the employee's performance. If Buffkin did the evaluation, and there was some notable disciplinary trouble during the previous year, it would be reflected in the scores. Lafarge rated each employee based on eight categories. They are:

1. Safety & Environmental Awareness[10]

---

[8] Of note, Connor filed a Title VII race discrimination suit against Lafarge. Connor's case is currently pending before the Honorable Karon Bowdre in this court. *Connor v. Lafarge N. Am., Inc.*, 07-1095 (N.D. Ala. 2008).

[9] Starting in 2006, there is some dispute by Buffkin as to whether Lafarge started employee evaluations on a semi-annual or quarterly basis. Buffkin testified he was uncertain. However, the court has no record of any such mid-year 2006 evaluations, which may or may not be relevant anyway, and thus focuses solely on the documentation in the record.

[10] 3-4. Exceptional safety and environmental consciousness. Participates in safety initiatives, may serve on a safety committee, encourages fellow workers to work safely and in an environmentally conscious manner.
  2-3. Works safely and has a high level of concern for the safety of those with whom he works. Takes initiative and personal action to eliminate safety and environmental hazards.
  1-2. Works safely and has concern for the safety of those with whom he works. Has a good awareness and a general concern for environmental issues.
  0-1. Works safely but keeps his opinions about the safe work habits of others to himself. Rarely considers the environmental impact of his actions.

2. Job Knowledge[11]
3. Quality of Work[12]
4. Teamwork[13]
5. Quantity of Work[14]
6. Initiative & Adaptability[15]

---

[11] 3-4. Superior knowledge of own and related jobs. Ability and willingness to apply knowledge in all job responsibilities.
    2-3. Extensive knowledge of own and related jobs. Ability and willingness to apply knowledge in all job responsibilities.
    1-2. Complete knowledge of own and related jobs. Ability and willingness to apply knowledge in all job responsibilities.
    0-1. Less than complete knowledge of own job and related jobs.

[12] 3-4. Exceptionally highly accurate producer.
    2-3. Exceeds standards of accuracy.
    1-2. Meets normal standards of accuracy; seldom makes mistakes.
    0-1. Meets minimum requirements but sometimes necessary to redo work.

[13] 3-4. Always perceived as a team player. Consistently willing to go above and beyond the call of duty. Interaction with co-workers and supervisors is always positive and effective.
    2-3. Understands his responsibilities as well as those of his team and supervisor. Uses that knowledge to support and encourage the efforts of the team members and supervisor.
    1-2. Meets expectations of interaction with co-workers and supervisors. Constructive; contributes to sound work relationships.
    0-1. Sometimes indifferent to supervisor's instructions or insensitive to co-workers. Does not sufficiently contribute to team efforts.

[14] 3-4. Always exceeds expected amount of work at accelerated speed. A very high producer.
    2-3. Consistently produces beyond expectations while working at high speed.
    1-2. Produces expected amount of work at normal speed.
    0-1. Output at or below minimum standards; often requires help completing job assignments.

[15] 3-4. Exceptional ability to adapt to the changing environment of the plant. Develops new ideas or methods and leads others in implementing. Learns rapidly and is extremely responsive to change.
    2-3. Implements change initiatives consistently by developing new ideas or methods and convincing others of their value. Quickly adapts to changing situations and organizes work in an orderly manner.
    1-2. Resourceful; makes original contributions. Absorbs new material; reacts well to change.
    0-1. Often relies on others; seldom suggests new ideas. Has difficulty in adjusting to change. Rejects change and may even work to undermine change efforts.

7. Dependability[16]
8. Judgment & Logic in Decision Making[17]

The evaluations are scored in descending order: 3-4/2-3/1-2/0-1. Four is the highest score an employee can receive, and zero is the lowest. A certain meaning attaches to each score. For example, "Job Knowledge" (3-4) is defined as "superior knowledge of own and related jobs. Ability and willingness to apply knowledge in all job responsibilities."[18] The following provides the relevant work history and employee evaluations, if available, for each candidate.

*A. Candidates Biographies and Evaluations*

Clements started working at Lafarge on or about January 3, 2006. From 2003 to 2005, he was a quality control supervisor for Ready Mix, Inc. ("Ready Mix"), a concrete pouring company. Notably, Ready Mix provided Clements with similar experience in loading and

---

[16] 3-4. Totally dependable in all areas. Goes out of his way to help others and stays busy at all times.
2-3. Requires minimum supervision always on the job. Goes over and above, looks for ways to be helpful and stay busy. Works his share of overtime.
1-2. Requires normal supervision regularly on the job follows instructions. Works required amount of overtime.
0-1. Requires more than normal supervision sometime needs to be redirected back to job assignment. General unavailable and unwilling to work overtime.

[17] 3-4. Superior judgment ability; always reaches logical and sound conclusions.
2-3. Demonstrates ability to think quickly and soundly; almost always reached logical conclusions.
1-2. Normal judgmental ability; usually reaches sound conclusions.
0-1. Has difficulty in reasoning; does not make decisions when necessary.

[18] For a complete list of all employee evaluation criteria, see *supra* notes 10-17.

inspecting concrete, but not the terminal operating (packing and shipping) aspects of a cement factory. From 2002 to 2004,[19] Clements was an engineer at Volkert, Inc., responsible for daily inspection of building/road projects. He had a high school education and some college education.[20] Since Clements began working for Lafarge in 2006, the record contains no annual evaluations for him.[21]

Walker started working at Lafarge on or about October 17, 2005. From June to September 2005, he was a machinist trainee at Alabama Dynamics. From April to June 2005 and from January 2001 to February 2005, he was a cashier at J&M Citgo gas station.[22] From

---

[19] The court only has the information filed by the parties, and, apparently, according to his resume, Clements worked for two companies at once in 2004, Ready Mix and Volkert.

[20] The record is less clear with respect to Clement's education. Clement's resume states: "1998-2001: George Wallace Community College." This does not by itself demonstrate, nor does the record show, Clements has an B.S. in engineering. Given the procedural posture, the court is required to view the facts in light most favorable to Jones, and thus, Clements does not have an engineering degree.

[21] Clements first opportunity to receive a semi-annual evaluation would have occurred in mid-2006. Clements arguably may have received a semi-annual employee evaluation after the hiring process began (approximately June/July 2006), but the record contains no such documentation. *See supra* note 9.

[22] In listing his experience at Citgo, Walker listed his job title as "Cashier/Managerial Duties." In his deposition, Walker responded to his managerial responsibilities as follows:

> Ms. Leonard (attorney for Jones): Did you supervise anyone [at J&M Citgo]?
> Walker: Not really, just vendors and stuff when they came in.
> Ms. Leonard: And those would be the people who might be bringing the milk in or the soft drinks or the potato chips?
> Walker: Yes, ma'am.
> Ms. Leonard: And supervising them, was it mainly instructing them where they needed to put inventory or stock?
> Walker: Inventory – or describing what our needs were and what items we needed them to bring in.

February to March 2005, he was a shipping clerk at Unique Industries, which threads steel. From January 2000 to January 2001, Walker worked as an assistant safety coordinator at Johnson Controls, Inc., responsible for safety checking equipment and conducting monthly safety meetings. Walker also earned a B.A. in political science from the University of Montevallo. On December 9, 2005, Walker received his first evaluation from Buffkin. Walker earned a score of "2" in Safety & Environmental Awareness, Job Knowledge, Dependability, and Judgment & Logic in Decision Making. He received "3s" in the other four categories. Of note, Wehrmeier wrote "get qualified on one of the two packhouse jobs" at the bottom of Walker's evaluation. Walker completed these qualifications prior the hiring process.

Connor started working at Blue Circle/Lafarge on or about January 2, 1989. Other than Jones's testimony that Connor had no supervisory experience, there is nothing in the record to demonstrate any other biographical work information concerning Connor. Additionally, like Clements, the record contains no annual employee evaluations for him.

Jones started working at Blue Circle/Lafarge on or about July 12, 2000. After graduation from high school, she enlisted in the

---

Walker Depo. at 12-13. Given the procedural posture, the court is required to view the facts in light most favorable to Jones, and thus, Walker does not have any supervisory experience, in terms of managing other personnel.

U.S. Army, serving as an accounting specialist from 1978 to 1981, receiving an honorable discharge. From 1982 to 1991, she held several jobs, including some basic accounting jobs. From approximately 1991 to 1996, Jones worked in the molding department of Alabaster Industries, both as an operator on a molding machine, making various plastic items, and also as needed in the shipping and receiving department. From approximately 1996 to 1998, she worked at ABC-NACO, Inc., (also known as "ABC Rail"), as a molding operator manufacturing train wheels. In 1998, Jones was promoted by ABC Rail to process control supervisor, wherein she was directly responsible for one person, compliance with OSHA regulations, and quality assurance of the wheels ABC Rail produced. After a year in this position, she was moved by ABC Rail to a "Heat Treat" supervisor position where she supervised ten employees monitoring the process of heating and treating the steel. As a supervisor, not only was she responsible for the ten employees' daily productivity, but also general supervisory duties including, discipline, overtime, and scheduling. From 1999 until July of 2000, she remained in this position. In 2000, Jones grew concerned about the ABC Rail plant closing, and thus sought employment from, and was later hired by, Blue Circle. During the interview with several Blue Circle supervisors/managers, including Buffkin, Jones was asked about her role at ABC Rail. She informed them of her supervisor positions. Jones states that she informed the hiring panel that she

wanted to continue in a supervisory role, but they informed her none were available at the time.

On December 8, 2005, Buffkin gave Jones her annual evaluation. Jones received "3s" in all categories except Initiative & Adaptability, in which she received a "2." In the comments under Safety & Environmental Awareness, Buffkin noted Jones was "on an ESAT Team and very active on it." ESAT is a Lafarge safety team that encourages, promotes, and trains personnel concerning safety.[23] Jones questioned Buffkin about her annual evaluation scores "quite a few times." Jones wanted to know why she was not receiving any "4s." The exact dates of the questioning are not in the record, but it is likely that they occurred prior to the 2006 interview process. The record is unclear whether Jones specifically questioned Buffkin about the December 8, 2005, evaluation. Buffkin testified Jones had "an aggressive attitude" and was "confrontational" when she asked Buffkin to "go over her scores." Jones admits she did inquire as to her scores, but avers that she was neither aggressive nor confrontational. Buffkin testified that he told Jones that her scores "[were] good score[s] not [] bad score[s]" and the scores were not meant to be competitive.

B. *The Job Opportunity Form*

The job opportunity form ("the form") posted in the packhouse originated as a quarry job opportunity form. Prior to its posting,

---

[23] The record does not reflect a definition for the acronym "ESAT."

Wehrmeier altered the quarry form to tailor it to the packhouse position. On or about April 25, 2006, the form was posted in the packhouse and online on Lafarge's website. The deadline for applying was May 4, 2006. Stokes was to receive all applications. Although Lafarge received applications from external candidates, Stokes and Schooner made the decision that Lafarge would only interview the four above candidates, based on a preference for internal promotion. The form states in pertinent part:

### JOB OPPORTUNITY FORM

Position Title: Shipping Supervisor
. . . .

Grade: 12
     For open positions grade 12 and below, open consideration will be given to applicants who live within close proximity to the job location. Lafarge may not be able to provide financial assistance to relocate an employee. However, **employees who feel their profile closely matches the job requirements are encouraged to apply so that geographical issues may be taken into consideration.**

. . . .

QUALIFICATIONS
Educational Background: High school graduate required, post-secondary education desirable.

Experience:
**Minimum of 2 year cement plant or terminal operating experience.**
    - Familiar with current MS office applications, and aptitude to learn additional computer systems
    - **Supervisory experience** and ability to interact as a team member
    - Ability to communicate effectively and understand customer issues in shipping
    - Able to take initiative based on sound problem solving skills
    - Commitment to the highest standards of safe work

12

```
habits
        - Knowledge of ERP or People Soft is a plus[24]
        - Ability to multi-task and make timely critical
decisions

. . . .
```

(emphasis supplied). Lafarge has no written policy stating that qualification requirements are relaxed for internal candidates. Lafarge avers, however, that there is an unwritten company policy relaxing qualification requirements for internal candidates.

In its reply brief, Lafarge relies heavily on the language "employees who feel their profile closely matches the job requirements are encouraged to apply . . .," omitting reference to the "so that geographical issues may be taken into consideration" language, for the proposition that Lafarge expressly refers to its unwritten company policy in the form itself. In interpreting this language, Stokes testified:

> It means that if they feel like they closely match [the form], if they feel like they could do the job, we encourage them to apply because we may be looking at geographical preference to not go and move somewhere from a different location or bring someone in and teach them all about Lafarge all over again. We give you credit for at least having been employed by Lafarge.

Also of note, it is uncertain whether the form was even distributed to the interview panel prior to or during the interview. For example, Griffin testified that he had not seen the form until questioned about at his deposition.

---

[24] People Soft is a software program the packhouse uses for bills of lading. The record does not demonstrate what "ERP" stands for.

*C. The Interview Process*

The four applicants went through two rounds of interviews.[25] In June 2006, Buffkin, Wehrmeier, Stokes, Griffin, and Ward conducted the first round of interviews. Although the intention was to have all five members of the panel interview each applicant at the same time, of the four candidates, only Jones had two sets of first round interviews. She interviewed first with Buffkin, Wehrmeier, and Ward, and then sometime later with Stokes and Griffin. The top two candidates from round one, Clements and Walker, were then sent to a second and final round interview with Bennett and Schooner. The panel questioned each candidate on the following interview topics:

1. Computer skills,
2. Troubleshooting skills,
3. Handling conflict,
4. Safety,
5. Maximizing production,
6. Flexibility, and
7. Poor performance of subordinates.

Also, the panel posed hypotheticals to see what candidates would do given a particular situation.

Then, sometime between the June 2006 interviews and the August 2006 hiring decision, the panel sat down to "rank" the candidates. Stokes provided the panelists a ranking/score sheet (hereinafter

---

[25] Of note, Jones failed to timely apply for the position. Jones avers that she met with Wehrmeier to discuss the position in early April 2006. Wehrmeier stated he was going to "choose the most qualified" applicant, and Jones believed this conversation was intended to discourage her from applying. Stokes later approached Jones and encouraged her to apply. Jones then applied.

"score sheet"). This was the first time any of the panelists, other than possibly Stokes, had seen or were aware of this score sheet.

During this meeting, the numerical scores were weighted by the interview panel, with an "X factor." Lafarge's purported intent was to give bonus points for doing better in certain categories. The panelists assigned raw scores based on their subjective impressions of the candidates. Candidates were ranked on the following ten categories:

| Category | X factor |
|---|---|
| Attitude/safety | 10 |
| Leadership | 9 |
| Communication | 8 |
| Decision-Making | 7 |
| Computer Work | 6 |
| Teamwork | 5 |
| Experience | 4 |
| Job Knowledge | 3 |
| Dependability/Initiative/ Adaptability | 2 |
| Equipment Skills | 1 |

The panel assigned a raw score for each candidate in each category, then Stokes divided the raw score by the X factor. For example, when Wehrmeier gave Jones a "3" in computer work, it was then

divided by "6," resulting in a weighted score of "0.5".[26] The effect
was to give equipment skills the most weight and attitude/safety
the least weight. This formula yielded the following scores:

1. Clements, weighted/averaged score: 2.25
2. Walker, weighted/averaged score: 2.17
3. Connor, weighted/averaged score: 2.08
4. Jones, weighted/averaged score: 2.07

In assigning the raw scores, panelists used their subjective
impressions. For example, Buffkin testified he assigned the raw
scores based approximately 90% on the interview and 10% from other
factors, including employee evaluations. Buffkin also testified
that he correlated, or attempted to correlate, the interview topics
with these ten categories. For instance, he correlated interview
topic "maximize production" with experience, job knowledge,
decision-making, and equipment skills and "poor performance of
subordinates" with job knowledge and "maybe" equipment skills. In
Buffkin's notes on the interview for interview topic "computer
skills," he wrote the following next to Clements, Walker, and
Jones: "experience on all [meaning software] - explained

---

[26] Stokes's declaration states she errantly divided the raw scores by
the X factor, when she was supposed to multiply them. Using the above
example, Jones should have received an 18 instead of a "0.5" in equipment
skills. Keeping the rest of the formula the same, the effect would be to
reverse the alleged importance of the categories, such that equipment skills
should be the least important, and attitude/safety would be the most
important. If Stokes had multiplied the X factor instead of dividing it, it
would have yielded the following rankings:
1. Clements, Weighted/Averaged Score: 43.82
2. Walker, Weighted/Averaged Score: 41.22
3. Jones, Weighted/Averaged Score: 36.98
4. Connor, Weighted/Averaged Score: 33.90
Note that Jones would have placed higher than Connor using this formula. In
any event, Clements and Walker would have advanced to the second round.

experiences good." When ranking them later, he gave Clements and Walker "9s" and Jones a "7." The other interviewers had similar problems identifying why Jones received lower scores in certain categories than her male counterparts.

Lafarge avers that Jones received low scores because her interview performance was not as good as her male counterparts. Lafarge stated Jones has or had a "casual attitude" toward safety throughout her time at Lafarge and that during the interview[27] she admitted she sometimes did not wear her safety belt and did not drive the forklifts safely. Buffkin and Ward testified to these admissions. Jones admits safety was an issue in the interviews, but denies any admissions.[28] Buffkin and Ward also testified that Jones failed to "satisfactorily answer" questions concerning troubleshooting equipment and that she lacked familiarity with equipment, including rail cars. Jones likewise denies these allegations.

Of note, Griffin was "a little bit surprised" when Walker got the promotion. He was surprised because of Walker's "limited

---

[27] Lafarge is likely alleging this occurred solely during her first round one interview with Buffkin, Wehrmeier, and Ward. Griffin testified that Jones did not have a bad interview on safety. He testified that when all five of the decision-makers got together, Wehrmeier and he discussed differing views on Jones's safety portion of the interview. In fact, Jones received raw scores of 9 from Griffin and Stokes on attitude/safety, and received "4, 2, and 0" from Buffkin, Wehrmeier, and Ward respectively, indicating a different performance on each interview.

[28] Jones admits she was counseled by Buffkin for two safety violations in 2001.

experience." In addition, following the interview, Jones avers that she met with Buffkin to ask why Walker received the promotion over her. She alleges that Buffkin told her he got the job because Walker "could discipline the men better . . . they felt the men would respect [Walker] better."

*II. Analysis*

*A. Which theory is Jones relying on?*

This case is a classic example of the problem that inheres in a complaint based upon one alleged adverse employment decision that has alternative proscribed motivations and ambiguous pleadings. Jones brings two claims under Title VII of the Civil Rights Act of 1964. She styles one claim "Count II: Race Discrimination Title VII Promotion" and the other "Count III: Sex Discrimination Title VII Promotion."[29] In these two sections, Jones alleges Lafarge's alleged adverse decision, failure to promote, is (1) based on "pretext" and (2) that Lafarge engages in a "pattern and practice of discriminat[ion]," without pointing to a specific theory for each. This lack of precision in pleading always leads to trouble. The court cannot tell which theory or theories apply to the claim of race and which to gender discrimination. Additionally, Jones neither discusses her status as a member of two distinct protected classes, namely black and female, nor suggests how the court should proceed given this situation. It could be that Jones is claiming

---

[29] Count I is Jones's 28 U.S.C. § 1981 race discrimination claim.

intersectional discrimination against black females as a protected group.

There are three theories of intentional discrimination that are actionable under Title VII: (1) disparate treatment discrimination; (2) disparate impact discrimination; and (3) a pattern or practice of discrimination. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000). Under theory (1), there are arguably two distinct theories, (a) individual disparate treatment and (b) systemic disparate treatment based on either a formal policy of discrimination or a pattern and practice of discrimination. "Pattern or practice" statistical data is relevant not only to a "pattern and practice" cause of action, but also the disparate treatment theories. *See, e.g., Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000)("Within the *McDonnell Douglas* individual disparate treatment model . . . statistical evidence is only one small part of a substantial web of evidence indicating pretext"; referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), discussed *infra*). The data is of course essential to a disparate impact cause of action. Thus, when Jones states in her complaint that "the defendant engages in a pattern and practice of discrimination in promotions on the basis of race," she fails expressly to direct the court to any specific theory of intentional discrimination.

Although Jones fails to address her dual status as a black

19

female in any of her court filings, in *Jefferies v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980), in a decision binding on this court, the Fifth Circuit held that black women are a "distinct protected subgroup for purposes of the [*McDonnell Douglas*] prima facie case and proof of pretext . . . ." *Id.* at 1034. As is arguably common in such "sex-plus" or "race-plus" claims, certain material facts may support one claim, such as sex discrimination, or another, race discrimination, or both, or may perhaps inversely cut against each other. Clearly this is not a square peg, square hole scenario for the court. However, in this case, Jones makes only one viable claim, namely individual disparate treatment. The gravamen of her claim is that, as a black female, she failed to receive the promotion to packhouse supervisor, and Lafarge instead promoted her white male counterpart, Walker, even though she was substantially more qualified. Since Lafarge concedes that Jones has presented a *prima facie* case, discussed *infra*, all the evidence presented will go toward her burden at the pretext stage. And as the court will discuss, even if she has somehow "hinted" her way into a systemic disparate treatment, disparate impact, or pattern and practice claim, only her individual disparate treatment claim has sufficient merit to survive Rule 56 analysis.

*B. Title VII[30] Race/Sex and § 1981 Race Discrimination Claims*

*1. Individual Disparate Treatment*

The parties and the court agree that Jones's Title VII race and gender claims against Lafarge are based solely upon circumstantial evidence. In order to prevail on a Title VII disparate treatment claim based on circumstantial evidence, the court applies the familiar burden shifting framework established by the Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981). Jones's § 1981 race discrimination claim also follows this framework. *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000). Jones must demonstrate race discrimination. Lafarge concedes that Jones has met her *prima facie* burden.[31] Lafarge then has a burden of production to rebut Jones's claim. "The burden then shifts to the defendant . . . to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a

---

[30] Title VII states in pertinent part: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

[31] To establish a *prima facie* case of disparate treatment under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified for the job. *See Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1322-23 (11th Cir. 2006); *see also Crawford v. W. Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980)(setting this Circuit's standard).

21

legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254 (citation omitted); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1123 (11th Cir. 1993). If the defendant-employer meets this intermediate burden, the presumption is eliminated, and the plaintiff "must establish that each of the defendant's proffered reasons for hiring someone of a different race is pretextual." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1104 (11th Cir. 2001)(citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007)(citations omitted). Here, Jones claims that Lafarge has failed to meet its intermediate burden. Alternatively, Jones claims that Lafarge's proffered reasons are pretextual. Lafarge, of course, denies both assertions. Each issue is discussed in turn.

*2. Jones argues Lafarge failed to meet its burden of production.*

The employer's burden of production here is neither "onerous, [nor] is it a mere formality. The [employer] may not satisfy its burden by presenting a hypothetical reason for the employment decision in question; instead it must raise a genuine issue of fact as to whether it discriminated against the plaintiff by making that decision." *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir.

1998)(internal quotations and citations omitted). The defendant's burden is "exceedingly light." *Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1185 (11th Cir. 2005)(citation omitted), *aff'd*, 550 U.S. ___, 127 S. Ct. 2162 (2007).

Lafarge's central argument is that Jones's poor interview performance (and thus her interview scores) were the reason Jones failed to receive the promotion. Lafarge cites to *Bass*, 256 F.3d at 1105, for the proposition that "poor interview performance - can be as legitimate as any other reason." *Id. Bass* is relevant not only for present purposes, but also for the pretext discussion *infra*.

a. Lafarge argues Bass is instructive

In *Bass*, plaintiff Bass sued his employer Orange County, Florida, alleging, *inter alia*, Title VII race discrimination and retaliation. Bass, a white male, was laid off when the county reorganized its fire department, and he later applied for one of three open training instructor positions. *Id.* at 1098-99. Every qualified, laid-off person was allowed to do so. *Id.* The job requirements included two years as a training instructor or closely related work experience. *Id.* Bass exceeded this and all other qualifications. *Id.* The interview panel consisted of three persons, all of whom were of not of Bass's race or gender. *Bass*, 256 F.3d at 1099. The panel asked pre-selected questions to "test their responses to hypothetical questions [candidates] may face on the job." *Id.* at 1098-99. The panel members lacked experience as

23

training instructors, lacked training on interviewing skills, did not receive the questions until right before the interview, and did not receive a job description. *Id.* at 1099-1100. They were not instructed to take notes on the interviews, and did not do so. *Id.* After the interviews were complete, the panel ranked the candidates based on their subjective impressions, and Bass finished ninth out of thirteen. *Id.* at 1099-1100. Of the three candidates that were hired, one was a black male who did not meet the basic qualification of two years experience. *Id.* at 1100. Importantly, Bass admitted he did not do very well in the interview. *Bass*, 256 F.3d at 1107. The interview was the only factor the panel utilized in their rankings, despite county policy to the contrary. *Id.* at 1099. Bass later successfully filed a union grievance and was given a training instructor position created especially for him. *Id.* at 1101-02. After some years of working under the title "training instructor," and being treated differently from the other three instructors, and deleteriously so, he filed his case. *Id.* The district court granted summary judgment to the county, but the Eleventh Circuit reversed. *Id.* The county had conceded that Bass met his *prima facie* case under *McDonnell Douglas*, and then stated its nondiscriminatory reason was Bass's poor interview performance. *Id.* at 1102. The Eleventh Circuit cautioned that "in order for a subjective reason to constitute a legally sufficient, legitimate, nondiscriminatory reason, the defendant must articulate a clear and

24

reasonably specific factual basis upon which it based its subjective opinion." *Id.* at 1106 (internal quotations and citations omitted). The court held (1) the interviewers had "explained the grounds for their subjective evaluations with reasonable clarity and specificity," concluded (2) that on this factual basis the county met its burden, and (3) moved to the pretext analysis. In the pretext analysis, the court found for Bass, in part, because the county promoted a less qualified candidate.

*b. Jones argues Blackledge is instructive*

Jones attempts to distinguish Lafarge's interpretation of *Bass* and also argues that *Blackledge v. Alabama Dep't of Mental Health and Mental Retardation*, No. 06-321, 2007 WL 3124452 (M.D. Ala. Oct. 25, 2007) applies here. Jones argues *Blackledge* stands for the proposition that an employer, when it subjectively scores candidates for promotion (using score sheets), who fails to identify the "process" the panel members used in their decision, cannot meet its burden of production. In *Blackledge*, the plaintiff Blackledge, a black female, was not promoted and sued her employer, the Alabama Department of Mental Health and Mental Retardation ("DMH/MR") and her boss, John Houston. The court examined the DMH/MR's alleged non-discriminatory reasons, including the defendant's assertion that Blackledge's combined score by the interview panel was lower than the white female who received the position. *Id.* at *18. The court found the three exhibits DMH/MR

25

used to support this argument to be unpersuasive, because, *inter alia*, DMH/MR failed to provide the court with all of the scoring sheets and the DMH/MR's decision-maker "merely says that the scores were assigned based upon the interviewees' experience, education, and the interview." *Id.* at *18. However, the court assumed *arguendo* that defendant had met its burden, and found the ambiguity in DMH/MR's explanation, coupled with other evidence, was enough to create a jury issue on pretext.

Neither *Bass* nor *Blackledge* fits the instant case like a glove. Here, there are multiple decision makers who have tied Jones's interview scores to subjective criteria and all of the scoring sheets are in the record, unlike *Blackledge*. Also, unlike *Blackledge*, the mere conclusory testimony of one decision maker and meager documentation are not present here. Lafarge has tied its justification to Jones's purported poor interview answers on safety, troubleshooting, and equipment knowledge based mainly on Buffkin and Wards' testimony. Jones disputes that she ever admitted to not wearing her seat belt or driving the forklift unsafely. Further, she disputes that she failed to successfully answer questions concerning troubleshooting, whereas in *Bass*, Bass admitted he performed poorly in the interview. Lafarge's burden here is exceedingly light, yet the court need not decide whether Lafarge met its burden.

The court finds that although Lafarge's argument that its

subjective evaluation of interview scores had "reasonably clarity and specificity" is arguably better supported than was DMH/MR's position in *Blackledge*, Lafarge's **method** in ranking the score sheets, coupled with the other reasons discussed below, creates a jury issue as to Lafarge's true motivations. Furthermore, because Jones disputes Buffkin and Ward's testimony about the interview, the court will assume *arguendo* that Lafarge has met its burden of production at this stage.

*3. Jones argues that Lafarge's reasons are pretextual.*

Jones has several arguments to suggest that Lafarge's reasons are pretextual. First, is Jones's satisfaction of the experience requirement compared to the lack of qualifications of her white, male counterparts establishes pretext. Second, is the fact that Lafarge relied on an unpublished practice to avoid applying qualifications for the packhouse supervisor position to white, male applicants which suggests pretext. Third, the reasons given by Lafarge for Ms. Jones's scores are not true, mainly Lafarge's justifications concerning disputes over Jones's interview answers. The court finds Jones's first two arguments are intertwined and persuasive, and thus discusses them together. The court adds a fourth, namely the method in ranking, noted above. Jones impliedly touches on this argument but fails to raise it expressly.

*a. Qualifications and Experience*

Jones's says she has superior qualifications. In such a

situation the Eleventh Circuit instructs:

> In a failure to promote case, a plaintiff cannot prove
> pretext by simply showing that she was better qualified
> than the individual who received the position that she
> wanted. A plaintiff must show not merely that the
> defendant's employment decisions were mistaken but that
> they were in fact motivated by sex . . . . Nevertheless,
> evidence showing an employer hired a less qualified
> applicant over the plaintiff may be probative of whether
> the employer's proffered reason for not promoting the
> plaintiff was pretextual.

*Lee v. GTE Florida Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). And
the Eleventh Circuit has repeatedly held that plaintiffs "must
adduce evidence that the disparity in qualifications was so
apparent as virtually to jump off the page and slap you in the
face." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1090 (11th
Cir. 2004)(internal quotations and citations omitted); *see also
Bass*, 256 F.3d at 1107 ("Hiring a less qualified person can support
an inference of discriminat[ion]."). For instance, in *Wilson*, the
court reversed the district court's grant of summary judgment on
plaintiff's failure to promote claim. In *Wilson*, the plaintiff
Wilson sued her employer, alleging, *inter alia*, failure to promote
based on superior qualifications in comparison with the promoted
candidate, Baker. The court held that because (1) several managers,
including the decision-maker, stated that Wilson was "more
qualified" than Baker and (2) that there was some circumstantial
evidence of discriminatory animus by a manager, based on the
alleged statement "women aren't typically in that type of
position," that Wilson could survive summary judgment. *Id.* at 1091-

28

92.

Here, pursuant to the terms of the job opportunity form, Jones was qualified for the job, and Walker was not. A qualification is "[t]he possession of qualities or properties . . . inherently necessary to make one eligible for a position . . . ." Black's Law Dictionary 1275 (8th ed. 1999). Jones has necessary "minimum 2 year cement plant experience or terminal operating experience." Walker had been working at Lafarge since approximately October 17, 2005. When the applications were due in May 2006, he had **six months and seventeen days** worth of experience in a cement plant. Nothing in the record indicates any of his previous experience, mainly at J&M Citgo, provided him with any "terminal operating experience" either. Even if the court looks to the August 28, 2006, approximate promotion date, Walker still had less than one year of experience. Furthermore, Clements, who started in January, and who made it to the final round of interviews, had even less experience that Walker or Jones.

Additionally, Lafarge listed "supervisory experience and ability to interact as a team member." Jones was the only one of the other three candidates who had any supervisory experience. Thus, on the face of the form, Walker is less qualified than Jones. Notably, Lafarge contends that there was an unwritten policy to relax the qualifications for internal employees and points to the form which states: "employees who feel their profile closely

29

matches the job requirements are encouraged to apply so that geographical issues may be taken into consideration." Stokes's interpretation of the form, explaining that it relates to moving and training costs, thwarts Lafarge's reply brief argument that "the [unwritten] practice is expressly referenced in the job posting." Even assuming Lafarge is correct inasmuch as the form's language is ambiguous, it likely relates to an external candidate compared with an internal candidate, not four internal candidates compared with each other who all work at same plant where the job opening exists. In addition, Lafarge had the opportunity to make the language "expressly reference" the unwritten policy when Wehrmeier's altered the form. He chose not to adjust the "minimum two year requirement" nor the "supervisory experience" language. Also, Griffin testified he was surprised when the job went to Walker and was unaware the form itself ever existed.

Moreover, Buffkin was allegedly concerned that Walker could "discipline the men better" than Jones. The potential inference from Buffkin's alleged statement is that Jones could not discipline the men as well because she is a woman. Also, Buffkin's interview notes contain the same notes for Walker, Clements, and Jones, but yield "9s" for the white males and a "7" for Jones. Like in *Wilson*, the clear language of the form and Jones's superior qualifications, coupled with the admissions of Griffin and the alleged discriminatory animus by Buffkin, creates a jury question on the

issue of pretext.

*b. Jones argues Lafarge's reasons for her scores are not true*

Even if Jones's interview is the paradigm case of "what not to do" in an interview, Jones's December 8, 2005, employee evaluation by Wehrmeier and Buffkin suggest that they found she excelled in almost every category, including safety, job knowledge, and quality of work, expressly rebutting the claim that Jones was poor on safety and troubleshooting. Buffkin testified he based his scores 90% on the interview and that the "employee evaluations" were not supposed to be competitive nor did he consider them in the interview process. A possible inference may be drawn that the interview process acted as or was a possible ruse where managers randomly pick and choose subjective criteria without objective guideposts, ignoring their own prior assessments of candidates. Of some consequence, although Walker had only been at Lafarge less than two months in December 2005, Buffkin chose to give him an evaluation anyway and ranked him below Jones.

*c. Method in Ranking/Scoring Candidates*

The court adds another reason that Jones's alluded to but never fully articulated. Although federal courts are "not in the business of adjudging whether employment decisions are prudent or fair," *Bass*, 256 F.3d at 1108, interviewers must explain their "subjective evaluation with reasonable clarity and specificity . . . ." *Id.* at 1106. The fact that the panel interviewed Jones based

on eight topics and then had to correlate those interview topics with ten criteria, emphasizes that the entire process was fraught with lack of reasonable specificity. Like the score sheets in *Blackledge*, the score sheets here only listed the category titles and numerical scores without explanation. Indeed, no member of the panel, with the exception of maybe Stokes, had ever even seen the ten score sheet categories prior to the interviews. Matching one criteria with another proved a difficult exercise. For example, Buffkin tried to correlate interview topic (5) "maximize production" with four separate ranking categories, namely experience, job knowledge, decision making, and equipment skills, with no discernable guidelines. This demonstrates lack of reasonable specificity. The court ponders, does each of the four ranking categories receive a potential 1/4 of the points for maximize production? How does each correlate? Did each panel member use the same correlation criteria?

While perhaps no single reason, by itself, is sufficient to demonstrate pretext, four reasons, when viewed together in the light most favorable to Jones, satisfy the court that a reasonable juror could find for Jones on the issue of pretext.

*C. Disparate Impact, Systemic Disparate Treatment, Pattern & Practice*

The record demonstrates that of approximately twenty-six supervisors at Lafarge, none of them are black females. It is well-settled that such unsupported assertions, while demonstrating

possible discrepancies between black and white workers, cannot without more add to the pretext analysis. *See Brown v. Am. Honda Co., Inc.*, 939 F.2d 946, 952 (11th Cir. 1991)(reasoning that the court must know how many blacks applied and failed versus how many equally qualified white applicants applied and failed; noting without such data the figures are "virtually meaningless"). For the same inadequacies, Jones has not made out a disparate impact case, lacking any reference to the relevant labor pool, an employment practice of Lafarge, or any nexus between the two. *See, e.g., Joe's Stone Crab,* 220 F.3d at 1274. Neither is there any identifiable policy pointing to systemic disparate treatment. Nor is this strong statistical evidence supporting a portion of a "pattern and practice claim." *Id.* at 1286-87. Generously assuming there is a pattern and practice claim here, the record fails to support discrimination is Lafarge's standard operation procedure, as opposed to an unusual practice. *Id.* at 1286-87.

## CONCLUSION

Based on the foregoing, Lafarge's motion for summary judgment will be partially denied and partially granted.

DONE this 21th day of October, 2008.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE